**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

<table>
<tr><td>

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

BRYAN GILBERT HENDERSON,
*Defendant-Appellant.*

</td><td>

No. 17-10230

D.C. No.
3:15-cr-00565-WHO-1

OPINION

</td></tr>
</table>

Appeal from the United States District Court
for the Northern District of California
William Horsley Orrick, District Judge, Presiding

Argued and Submitted August 14, 2018
San Francisco, California

Filed October 23, 2018

Before: Diarmuid F. O'Scannlain and Carlos T. Bea,
Circuit Judges, and Richard G. Stearns,* District Judge.

Opinion by Judge O'Scannlain

---

*The Honorable Richard G. Stearns, United States District Judge for the District of Massachusetts, sitting by designation.

## SUMMARY[**]

### Criminal Law

The panel affirmed the district court's denial of a motion to suppress evidence, including evidence seized in California, pursuant to a Network Investigative Technique ("NIT") warrant issued by a magistrate judge in the Eastern District of Virginia, in a case in which the defendant entered a conditional guilty plea to receipt of child pornography.

The panel held that the NIT warrant violated Fed. R. Crim. P. 41(b) by authorizing a search outside of the issuing magistrate judge's territorial authority. The government did not dispute that the NIT warrant exceeded the general territorial scope identified in Fed. R. Crim. P. 41(b)(1) by authorizing a search of an "activating computer" in California, and the panel rejected the government's contention that the NIT mechanism is a "tracking device" for which out-of-district warrants are authorized by Fed. R. Crim. P. 41(b)(4).

Considering whether the violation of Rule 41(b) compels suppression, the panel agreed with the defendant that Rule 41(b) is not merely a technical venue rule, but rather is essential to the magistrate judge's jurisdiction to act in this case. The panel held that a warrant purportedly authorizing a search beyond the jurisdiction of the issuing magistrate judge is void under the Fourth Amendment, and that the Rule 41 violation was a fundamental, constitutional error.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel concluded that the good faith exception to the exclusionary rule applied to bar suppression of the evidence obtained against the defendant pursuant to the NIT warrant. The panel rejected the defendant's contention that the good faith exception does not apply to warrants that are void *ab initio*. The panel rejected the defendant's contention that the government acted in bad faith in seeking the warrant, noting that at the time the government applied for the NIT warrant, the legality of the investigative technique was unclear. The panel wrote that there is no evidence that the officers executing the NIT warrant acted in bad faith; and that suppression of the evidence against the defendant is unlikely to deter future violations of this specific kind because the conduct at issue is, after a December 2016 amendment, authorized by Fed. R. Crim. P. 41(b)(6).

---

## COUNSEL

Hanni M. Fakhoury (argued), Assistant Federal Public Defender; Steven G. Kalar, Federal Public Defender; Office of the Federal Public Defender, Oakland, California; for Defendant-Appellant.

John P. Taddei (argued), Appellate Section; Matthew S. Miner, Deputy Assistant Attorney General; John P. Cronan, Acting Assistant Attorney General; Criminal Division, United States Department of Justice, Washington, D.C.; J. Douglas Wilson, Assistant United States Attorney; Alex G. Tse, United States Attorney; United States Attorney's Office, San Francisco, California; for Plaintiff-Appellee.

Mark Rumold and Andrew Crocker, Electronic Frontier Foundation, San Francisco, California, for Amicus Curiae Electronic Frontier Foundation.

Jennifer S. Granick, American Civil Liberties Union Foundation, San Francisco, California; Brett Max Kaufman and Vera Eidelman, American Civil Liberties Union Foundation, New York, New York; Linda Lye, American Civil Liberties Union Foundation of Northern California, San Francisco, California; Mateo Caballero, ACLU of Hawai'i Foundation, Honolulu, Hawai'i; Kathleen E. Brody, ACLU Foundation of Arizona, Phoenix, Arizona; Mathew dos Santos, ACLU Foundation of Oregon Inc., Portland, Oregon; for Amici Curiae American Civil Liberties Union, ACLU of Northern California, ACLU of Arizona, ACLU of Hawai'i, and ACLU of Oregon.

## OPINION

O'SCANNLAIN, Circuit Judge:

In this child pornography case, we must decide whether evidence that was obtained pursuant to a warrant that authorized a search of computers located outside the issuing magistrate judge's district must be suppressed.

### I

### A

In 2014, the Federal Bureau of Investigation ("FBI") began investigating the internet website upf45jv3bziuctml.onion, "Playpen," which was used to send and to receive child pornography. Playpen operated on an anonymous network known as "The Onion Router" or "Tor". To use Tor, the user must download and install the network software on his computer. Tor then allows the user

to visit any website without revealing the IP address,[1] geographic location, or other identifying information of the user's computer by using a network of relay computers.

Tor also allows users to access "hidden services," which are websites that are accessible only through the Tor network and are not accessible publicly. A hidden-service website hosted on the Tor network does not reveal its location; a Tor user can access the hidden-service website without knowing the location of its server and without its knowing the user's location.

Playpen operated as a hidden-service website and required users to log in with a username and password to access its discussion forums, private messaging services, and images of child pornography. After determining that Playpen was hosted on servers located in Lenoir, North Carolina, the FBI obtained and executed a valid search warrant in the Western District of North Carolina in January 2015, and seized the Playpen servers. The FBI removed the servers to its facility in Newington, Virginia. Because Tor conceals its users' locations and IP addresses, additional investigation was required to identify Playpen users. The FBI then operated the Playpen website from a government-controlled server in Newington in the Eastern District of Virginia, from which it obtained a valid court order authorizing it to intercept electronic communications sent and received by the site's administrators and users.

The FBI later obtained a warrant from a United States magistrate judge in the Eastern District of Virginia on

---

[1] An IP address is a "unique numerical address" assigned to every computer and can serve as its identifying characteristic. *United States v. Forrester*, 512 F.3d 500, 510 n.5 (9th Cir. 2008) (citation omitted).

February 20, 2015, authorizing searches for thirty days using what is known as a Network Investigative Technique ("NIT"). Specifically, such "NIT warrant" authorized the search of all "activating" computers—that is, those of any website visitor, *wherever located*, who logged into Playpen with a username and password.[2]   The NIT technology is computer code consisting of a set of instructions. When a person logged into the Playpen site, the NIT caused instructions to be sent to his computer, which in turn caused the computer to respond to the government-controlled server with seven pieces of identifying information, including its IP address.   The NIT mechanism allowed the FBI, while controlling the website from within the Eastern District of Virginia, to discover identifying information about activating computers, even though Playpen operated on the Tor network.

On March 1, 2015, a person logged into Playpen under the username "askjeff."  The NIT instructions were sent to askjeff's computer, which revealed its IP address through its response to the government-controlled server. The computer response also revealed that askjeff had been actively logged into Playpen for more than thirty-two hours since September 2014 and had accessed child pornography. The FBI traced the IP address to an internet service provider ("ISP"), Comcast   Corporation,   which   was   served   with   an

---

[2] The warrant stated: "This warrant authorizes the use of a network investigative technique ("NIT") to be deployed on the computer server . . . operating the Tor network child pornography website referred to herein as the TARGET WEBSITE, . . . which will be located at a government facility in the Eastern District of Virginia."  The warrant further provided that, through the NIT, the government may obtain information, including IP address, from all "activating computers"— "those of any user or administrator who logs into the TARGET WEBSITE by entering a username and password."

administrative subpoena requesting information about the user assigned to the IP address. The IP address turned out to be associated with a computer at the San Mateo, California, home of Bryan Henderson's grandmother, with whom Henderson lived. A local federal magistrate judge in the Northern District of California issued a warrant to search the home, where the FBI then discovered thousands of images and hundreds of videos depicting child pornography on Henderson's computer and hard drives.

B

Henderson was indicted in the Northern District of California on charges of receipt and possession of child pornography, in violation of 18 U.S.C. § 2252(a)(2), (a)(4)(B), and (b)(2).

Henderson moved to suppress all evidence, including the evidence seized at his grandmother's home in California, obtained pursuant to the "NIT warrant" issued by the Eastern District of Virginia.[3] The district court denied Henderson's motion to suppress.

Henderson then pled guilty to receipt of child pornography, but expressly reserved the right to appeal the district court's denial of his motion to suppress. Henderson

---

[3] Henderson challenges only the warrant issued by the Eastern District of Virginia on February 20, 2015, authorizing the use of the NIT. He does not argue that the warrant issued in the Western District of North Carolina, which resulted in the seizure of the Playpen servers, or the warrant issued in the Northern District of California, which led to the search of Henderson's home and computer, is invalid. Nor does he challenge the validity of the court order authorizing the FBI to intercept electronic communications through the Playpen website.

was sentenced to sixty months in prison and a ten-year term of supervised release.

Henderson timely appealed, challenging the denial of his motion to suppress.

## II

Henderson argues that the motion to suppress should have been granted because the NIT warrant was issued in violation of Federal Rule of Criminal Procedure 41(b), which authorizes magistrate judges to issue warrants subject to certain requirements. To prevail on his argument, Henderson must show both that the NIT warrant *did* violate Rule 41(b) and that suppression is the appropriate remedy for such violation.

## A

Henderson urges that no provision within Rule 41(b) authorizes a magistrate judge to issue the NIT warrant to search computers located outside of her district.

In general, Rule 41(b) permits "a magistrate judge with authority in the district . . . to issue a warrant to search for and seize a person or property *located within the district*." Fed. R. Crim. P. 41(b)(1) (emphasis added). Judge Orrick concluded that the NIT warrant indeed violated Rule 41(b), because it was obtained in the Eastern District of Virginia, yet it authorized a search of computers located outside of that district.[4] The government does not dispute that the NIT

---

[4] The government concedes that a "search" occurred when the NIT was deployed to users' computers and returned their identifying information. As two of our sister circuits have before us, we agree. *See United States v. Werdene*, 883 F.3d 204, 213 n.7 (3d Cir. 2018) ("The

warrant exceeded the general territorial scope identified in Rule 41(b)(1) by authorizing a search of an "activating computer" in California.

However, the government counters that the NIT warrant was nonetheless authorized under Rule 41(b)(4)'s specific provision for tracking devices, which permits "a magistrate judge with authority in the district . . . to issue a warrant to install within the district a tracking device . . . to track the movement of a person or property located within the district, outside the district, or both." Fed. R. Crim. P. 41(b)(4). Rule 41 defines a "tracking device" as "an electronic or mechanical device which permits the tracking of the movement of a person or object." Fed. R. Crim. P. 41(a)(2)(E); 18 U.S.C. § 3117(b).

The government contends that Henderson's computer made a "virtual trip" to the government server in the Eastern District of Virginia when he logged into the Playpen website. According to the government, his computer then "brought" the NIT instructions, along with the usual Playpen website content, back with it from the government server to his computer's physical location in California. The NIT instructions then caused identifying location information to be transmitted back to the government, just like a beeper or other tracking device would.

We are not persuaded by the government's assertions. The NIT instructions did not actually "track the movement

District Court wrongly concluded that . . . Werdene had no reasonable expectation of privacy in his IP address."); *United States v. Horton*, 863 F.3d 1041, 1047 (8th Cir. 2017) (noting that a defendant "has a reasonable expectation of privacy in the contents of his personal computer" and concluding that "the execution of the NIT in this case required a warrant").

of a person or property," as required by the tracking-device provision. Fed. R. Crim. P. 41(b)(4). Rather, the NIT mechanism was simply a set of computer instructions that forced activating computers, regardless of their location, to send certain information to the government-controlled server in Virginia. Users' computers did not physically travel to Virginia, and the information they relayed did not reveal the physical location of any person or property, unlike a beeper attached to a vehicle. The "seized information (mainly the IP address) assisted the FBI in identifying a user, [but] it provided no information as to the computer's or user's precise and contemporary physical location." *United States v. Werdene*, 883 F.3d 204, 212 (3d Cir. 2018). Indeed, the only two federal courts of appeals to consider the question have rejected the government's very argument. As the Eighth Circuit has recognized, "the plain language of Rule 41 and the statutory definition of 'tracking device' do not . . . support so broad a reading as to encompass the mechanism of the NIT used in this case." *United States v. Horton*, 863 F.3d 1041, 1048 (8th Cir. 2017) (internal quotation marks omitted); *accord. Werdene*, 883 F.3d at 211–12.

Interestingly, Rule 41(b) was amended on December 1, 2016—after the issuance of the NIT warrant here—to authorize magistrate judges to issue warrants to search computers located outside their district if "the district where the media or information is located has been concealed through technological means." Fed. R. Crim. P. 41(b)(6). As our sister circuits have recognized, such amendment plainly seems to "authorize[] warrants such as the NIT warrant here." *Werdene*, 883 F.3d at 206 n.2; *see also Horton*, 863 F.3d at 1047 n.2 (noting that Rule "41(b)(6) was added to provide an additional exception to the magistrate's jurisdictional limitation by allowing warrants for programs

like the NIT"). The fact that Rule 41 was amended to authorize specifically these sorts of warrants further supports the notion that Rule 41(b) did not previously do so.

In sum, the NIT mechanism is not a "tracking device" within the meaning of Federal Rule of Criminal Procedure 41(b)(4), and the government does not argue that any other provision in Rule 41(b) applies. We are satisfied that the NIT warrant violated Rule 41(b) by authorizing a search outside of the issuing magistrate judge's territorial authority.

## B

But does a warrant issued in violation of Rule 41(b) compel suppression of evidence? Not necessarily.

Only certain Rule 41 violations justify suppression. The suppression of evidence is "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved." *United States v. McLamb*, 880 F.3d 685, 690 (4th Cir. 2018) (quoting *United States v. Leon*, 468 U.S. 897, 906 (1984)). To determine whether suppression is justified, we must first decide whether the Rule 41(b) violation is a "fundamental error[]" or a "mere technical error[]." *United States v. Negrete-Gonzales*, 966 F.2d 1277, 1283 (9th Cir. 1992). Fundamental errors are those that "result in . . . constitutional violations," and they generally *do* require suppression, "unless the officers can show objective good faith reliance as required by" the good faith exception to the exclusionary rule under the Fourth Amendment. *Id.* By contrast, non-fundamental, merely technical errors require suppression only if the defendant can show either that (1) he was prejudiced by the error, or (2) there is evidence of "deliberate disregard of the rule." *Id.* We need not consider

these additional factors if we determine that the Rule 41 violation was indeed fundamental.

1

Henderson contends that the violation here was fundamental. Specifically, he argues that the NIT warrant violated the Fourth Amendment because, by issuing the warrant in violation of Rule 41(b), the magistrate judge acted beyond her constitutional authority. The government disagrees, characterizing Rule 41(b) as merely a technical "venue provision" that does not implicate the scope of a magistrate judge's underlying authority or the Fourth Amendment.

We agree with Henderson that Rule 41(b) is not merely a technical venue rule, but rather is essential to the magistrate judge's authority to act in this case.

Federal magistrate judges "are creatures of statute." *NLRB v. A-Plus Roofing, Inc.*, 39 F.3d 1410, 1415 (9th Cir. 1994). The Federal Magistrates Act, 28 U.S.C. § 636, defines the scope of a magistrate judge's authority, imposing jurisdictional limitations on the power of magistrate judges that cannot be augmented by the courts. *See A-Plus Roofing, Inc.*, 39 F.3d at 1415; *cf. United States v. Krueger*, 809 F.3d 1109, 1122 (10th Cir. 2015) (Gorsuch, J., concurring) ("Section 636(a)'s territorial restrictions are *jurisdictional* limitations on the power of magistrate judges.").

Relevant here, § 636 authorizes magistrate judges to exercise "all powers and duties conferred or imposed" by the Federal Rules of Criminal Procedure. 28 U.S.C. § 636(a)(1). In turn, Rule 41(b) has been asserted as the sole source of the magistrate judge's purported authority to issue the NIT warrant in this case. But, as we have explained, in issuing

such warrant, the magistrate judge in fact *exceeded* the bounds of the authority conferred on magistrate judges under Rule 41(b).  Thus, such rule plainly does *not* in fact confer on the magistrate judge the authority to issue a warrant like the NIT warrant.  Without any other source of law that purports to authorize the action of the magistrate judge here, the magistrate judge therefore exceeded the scope of her authority and her jurisdiction as defined under § 636.[5]

---

[5] Moreover, even if the government were correct in asserting that Rule 41(b) was not violated or that such Rule is merely a technical venue provision, the government fails to grapple with the independent territorial limitations imposed upon a magistrate judge's jurisdiction by § 636 *itself*.  *See* 28 U.S.C. § 636(a) (magistrate judges hold their powers "within the district in which sessions are held by the court that appointed the magistrate judge, at other places where that court may function, and elsewhere as authorized by law").  That is, even if the government is correct that the magistrate did not exceed her statutory authority as a result of the Rule 41(b) violation, such action may still have *independently* violated § 636's similar territorial restrictions.  *See Krueger*, 809 F.3d at 1121 ("[E]ven Rule 41(b) is consistent with the notion that § 636(a) imposes independent territorial restrictions on the powers of magistrate judges.")  And, once again, if the magistrate judge *did* violate § 636's own inherent territorial limitations, such action therefore exceeded the bounds of her statutory authority.  *See A-Plus Roofing, Inc.*, 39 F.3d at 1415 ("[M]agistrates are creatures of statute, and so is their jurisdiction. We cannot augment it; we cannot ask them to do something Congress has not authorized them to do."); *Krueger*, 809 F.3d at 1119 (Gorsuch, J., concurring) ("I do not doubt that the [Rule 41] error here is one of statutory dimension . . . .  As a matter of plain language, [§ 636] indicates that rulemakers may provide *what* powers a magistrate judge will have.   But the statute also expressly and independently limits *where* those powers will be effective.").  We need not and do not consider whether the NIT warrant in this case would be permitted under § 636's independent territorial limitations.

2

Having concluded that the magistrate judge issued a warrant in excess of her jurisdictional authority to do so, we next must determine whether conducting a search pursuant to such a warrant violates the Fourth Amendment. *See Negrete-Gonzales*, 966 F.2d at 1283 (noting that fundamental Rule 41 violations are those that result in constitutional violations).

The Fourth Amendment to the U.S. Constitution guarantees:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.  This guarantee "must provide *at a minimum* the degree of protection it afforded when it was adopted." *United States v. Jones*, 565 U.S. 400, 411 (2012); *see also Atwater v. City of Lago Vista*, 532 U.S. 318, 326 (2001) ("In reading the Amendment, we are guided by the traditional protections against unreasonable searches and seizures afforded by the common law at the time of the framing." (internal quotation marks omitted)).  Thus, we must look to the original public meaning of the Fourth Amendment.

At the time of the framing, it was understood that "[w]hen a warrant is received by [an] officer, he is bound to execute it," only "so far as the jurisdiction of the magistrate

and himself extends." 4 William Blackstone, Commentaries *291 (*cited by Krueger*, 809 F.3d at 1123 n.4). And, "[a]cts done beyond, or without jurisdiction," according to Blackstone, "are utter nullities." Samuel Warren, Blackstone's Commentaries, Systematically Abridged and Adapted 542 (2d. ed. 1856). Sir Matthew Hale likewise wrote that a warrant is valid only "within the jurisdiction of the justice granting or backing the same." 2 Matthew Hale, Historia Placitorum Coronae 110 n.6 (1736). Thomas Cooley later recognized the same principle in his canonical treatise on American constitutional law: in order for a reasonable search or seizure to be made, "a warrant must issue; and this implies . . . a court or magistrate empowered by the law to grant it." Thomas M. Cooley, The General Principles of Constitutional Law in the United States of America 210 (1880) (*cited by Krueger*, 809 F.3d at 1124).

Contemporary courts have agreed. In *United States v. Krueger*, for example, the Tenth Circuit considered a territorially deficient warrant issued by a magistrate judge in the District of Kansas that authorized a search of a home and car in Oklahoma. 809 F.3d at 1111. The court held that the warrant violated Rule 41, but left open the question of whether such violation also contravened the Fourth Amendment. *Id.* at 1114–15. Then-Judge Gorsuch concurred separately and argued that such a warrant did violate the Fourth Amendment. He wrote, "When interpreting the Fourth Amendment we start by looking to its original public meaning. . . . The principle animating the common law at the time of the Fourth Amendment's framing was clear . . . [and] [m]ore recent precedent follows this long historical tradition." *Id.* at 1123–24 (Gorsuch, J., concurring). After examining both the historical tradition and recent precedent, then-Judge Gorsuch concluded:

[L]ooking to the common law at the time of the framing it becomes quickly obvious that a warrant issued for a search or seizure beyond the territorial jurisdiction of a magistrate's powers under positive law was treated as no warrant at all—as *ultra vires* and *void ab initio* . . .—as null and void without regard to potential questions of 'harmlessness.'

809 F.3d at 1123. Therefore, "a warrant may travel only so far as the power of its issuing official." *Id.* at 1124.

Two other circuits have considered this question in relation to the same Eastern District of Virginia NIT warrant at issue here, and each adopted the approach of then-Judge Gorsuch in *Krueger*. Both circuits concluded that the Rule 41 violation is a fundamental, constitutional error.[6] In *Werdene*, the Third Circuit determined that the NIT warrant was "void *ab initio* because it violated § 636(a)'s jurisdictional limitations and was not authorized by any positive law." 883 F.3d at 214. Citing then-Judge Gorsuch's observation in *Krueger* that, at the time of the framing, such a warrant "was treated as no warrant at all," the court held that the violation was therefore "of constitutional magnitude." *Id.* (citing *Krueger*, 809 F.3d at 1123 (Gorsuch, J., concurring)). Similarly, in *Horton*, the Eighth Circuit agreed that the NIT warrant was "invalid at its inception and therefore the constitutional equivalent of a warrantless search." *Horton*, 863 F.3d at 1049. Therefore, the Eighth

---

[6] Three other circuits have assumed without deciding that the NIT warrant violated the Fourth Amendment. *See United States v. McLamb*, 880 F.3d 685 (4th Cir. 2018); *United States v. Levin*, 874 F.3d 316 (1st Cir. 2017); *United States v. Workman*, 863 F.3d 1313 (10th Cir. 2017).

Circuit concluded, "the NIT warrant was void *ab initio*, rising to the level of a constitutional infirmity." *Id.*

The weight of authority is clear: a warrant purportedly authorizing a search beyond the jurisdiction of the issuing magistrate judge is void under the Fourth Amendment. We agree with our sister circuits' analysis and conclude that the Rule 41 violation was a fundamental, constitutional error.

## C

Even though the Rule 41 violation was a fundamental, constitutional error, suppression of evidence obtained in violation of the Fourth Amendment is still not appropriate if, as it asserts, the government acted in good faith. *See Negrete-Gonzales*, 966 F.2d at 1283.

Indeed, whether to suppress evidence under the exclusionary rule is a separate question from whether a Fourth Amendment violation has occurred. *See Herring v. United States*, 555 U.S. 135, 140 (2009); *Leon*, 468 U.S. at 906. The exclusionary rule applies only when "police conduct [is] sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring*, 555 U.S. at 144. The exclusionary rule does not apply "when law enforcement officers have acted in objective good faith or their transgressions have been minor," because "the magnitude of the benefit conferred on such guilty defendants offends basic concepts of the criminal justice system." *Leon*, 468 U.S. at 908. Of crucial importance here, suppression of evidence is not appropriate "if the police acted 'in objectively reasonable reliance' on the subsequently invalidated search warrant." *Herring*, 555 U.S. at 142 (quoting *Leon*, 468 U.S. at 922). The reasonableness of the executing officers' reliance on the

warrant and whether there is "appreciable deterrence" sufficient to justify the costs of suppression here must be taken into account. *Herring*, 555 U.S. at 141 (quoting *Leon*, 468 U.S. at 909).

1

Henderson contends that the good faith exception to the exclusionary rule should not apply here.

First, Henderson urges that the good faith exception does not apply to warrantless searches, and therefore does not apply to searches pursuant to warrants that are void *ab initio* because they are effectively warrantless. We find no support for such a sweeping assertion.

We have held that the good faith exception "may apply to both technical and fundamental errors" under Rule 41. *Negrete-Gonzales*, 966 F.2d at 1283. And "our good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal in light of all the circumstances." *Herring*, 555 U.S. at 145 (internal quotation marks omitted).

In focusing on the notion of a warrantless search, Henderson asks the wrong question. Application of the good faith exception does not depend on the existence of a warrant, but on the executing officers' *objectively reasonable belief* that there was a valid warrant. "The exclusionary rule was crafted to curb police rather than judicial misconduct." *Herring*, 555 U.S. at 142. For example, the Supreme Court has applied the good faith exception where a clerk mistakenly told an officer that an arrest warrant that had been recalled was still outstanding, *id.* at 137–38, and where officers have relied on a computer entry that mistakenly showed that an arrest warrant existed,

*Arizona v. Evans*, 514 U.S. 1, 15–16 (1995). Contrary to Henderson's argument, the exception therefore may preclude suppression of evidence obtained during searches executed even when no warrant in fact existed—if the officers' reliance on the supposed warrants was objectively reasonable.

If the exception may apply in cases where an officer relied on a valid warrant which had been revoked or a warrant which never existed, may the exception apply where the officer relied on a warrant subsequently recognized as void due to the issuing judge's jurisdictional violation? As the Third Circuit has explained, "the good faith exception applies to warrants that are void *ab initio* because 'the issuing magistrate's lack of authority has no impact on police misconduct.'" *Werdene*, 883 F.3d at 216–17 (quoting *United States v. Master*, 614 F.3d 236, 242 (6th Cir. 2010)). The Eighth Circuit likewise holds that "relevant Supreme Court precedent leads . . . to a similar conclusion: that the *Leon* exception can apply to warrants void *ab initio* like this one." *Horton*, 863 F.3d at 1050. The exclusionary rule applies only when suppression of the evidence can meaningfully deter sufficiently deliberate police conduct, *Herring*, 555 U.S. at 144, and "[p]enalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations." *Horton*, 863 F.3d at 1050 (quoting *Leon*, 468 U.S. at 921) (alteration in original). Therefore, application of the good faith exception is permitted where a warrant is void because of a magistrate judge's jurisdictional violation, so long as the executing officers had an objectively reasonable belief that the warrant was valid. We are unconvinced by Henderson's argument otherwise, and we are satisfied that the good faith exception may apply to warrants that are void *ab initio*.

2

Henderson next argues that, even if the exception does apply to warrants that are void *ab initio*, it should not apply here because the government acted in bad faith. Further, Henderson argues that suppression of the evidence would deter similarly improper conduct in the future.

Prior to the Rule 41(b)(6) addition, the Federal Rules of Criminal Procedure did not directly address a NIT-type of warrant. At the time the government applied for the NIT warrant, "the legality of [the] investigative technique [was] unclear." *McLamb*, 880 F.3d at 691. In fact, although every circuit court that has addressed the question has found that the NIT warrant violated Rule 41, "a number of district courts have ruled [it] to be facially valid." *Horton*, 863 F.3d at 1052. Henderson's argument that the government acted in bad faith in seeking the warrant is not compelling.

Furthermore, there is no evidence that the officers executing the NIT warrant acted in bad faith. "To the extent that a mistake was made in issuing the warrant, it was made by the magistrate judge, not by the executing officers." *United States v. Levin*, 874 F.3d 316, 323 (1st Cir. 2017). Henderson correctly notes that officers' reliance on a warrant is not objectively reasonable when the warrant is "so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid." *Leon*, 468 U.S. at 923; *accord. United States v. Luong*, 470 F.3d 898, 902 (9th Cir. 2006). However, the NIT warrant sufficiently described the "place" to be searched—any "activating computer"—and specified the seven pieces of identifying information—including the computer's IP address—that would be seized, and presented no other facial deficiency that rendered the officers' reliance unreasonable.

Again, one is left to wonder how an executing agent ought to have known that the NIT warrant was void when several district courts have found the very same warrant to be valid. We agree with our sister circuits that have concluded that "[t]he warrant was . . . far from facially deficient." *Werdene*, 883 F.3d at 217; *accord. McLamb*, 880 F.3d at 691; *Levin*, 874 F.3d at 323; *Horton*, 863 F.3d at 1052; *United States v. Workman*, 863 F.3d 1313, 1317–18 (10th Cir. 2017).

Further, suppression of the evidence against Henderson is unlikely to deter future violations of this specific kind, because the conduct at issue is now authorized by Rule 41(b)(6), after the December 2016 amendment. The exclusionary "rule's sole purpose, we have repeatedly held, is to deter future Fourth Amendment violations," *Davis v. United States*, 564 U.S. 229, 236–237 (2011), and we see no reason to deter officers from reasonably relying on a type of warrant that could have been valid at the time it was executed—and now would be.

"[A] warrant issued by a magistrate normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search." *Leon*, 468 U.S. at 922 (internal quotation marks omitted). The NIT warrant is not facially deficient and there is no specific evidence that the officers did not act in good faith. We are satisfied that the NIT warrant falls squarely within the *Leon* good faith exception: the executing officers exercised objectively reasonable reliance on the NIT warrant, and "the marginal or nonexistent benefits produced by suppressing evidence . . . cannot justify the substantial costs of exclusion." *Id.* Indeed, the five circuits that have addressed motions to suppress evidence obtained pursuant to the NIT warrant have denied suppression on the basis of the good faith exception. *See Werdene*, 883 F.3d at 218–19; *McLamb*, 880 F.3d at

690–91; *Levin*, 874 F.3d at 324; *Horton*, 863 F.3d at 1051–52; *Workman*, 863 F.3d at 1319–21.

We agree with our sister circuits, and hold that the good faith exception applies to bar suppression of evidence obtained against Henderson pursuant to the NIT warrant.

### III

The judgment of the district court is **AFFIRMED.**