NEWSOM, Circuit Judge:
James Taylor and Steven Smith are the latest in a long line of child-pornography consumers to argue that the evidence of their crimes should be suppressed because the warrant that led to its discovery-issued by a magistrate judge in the Eastern District of Virginia but purporting to authorize a nationwide, remote-access computer search-violated the Fourth Amendment. By our count, we become today the eleventh (!) court of appeals to assess the constitutionality of the so-called "NIT warrant." Although the ten others haven't all employed the same analysis, they've all reached the same conclusion-namely, that evidence discovered under the NIT warrant need not be suppressed. We find no good reason to diverge from that consensus here, but the case nonetheless calls for careful consideration, as it implicates several important issues.
As an initial matter, did the NIT warrant violate Federal Rule of Criminal Procedure 41(b), which specifies where and in what circumstances a magistrate judge may issue a warrant-and relatedly, if the warrant did violate Rule 41(b), was that violation of constitutional magnitude? We hold that because the magistrate judge's actions exceeded not only Rule 41(b) but also her statutorily prescribed authority under the Federal Magistrates Act, 28 U.S.C. § 636(a) -which circumscribes the scope of a magistrate judge's jurisdiction-the warrant was void ab initio , rendering any search purporting to rely on it warrantless and thus presumptively unlawful under the Fourth Amendment.
That leads us to the question of remedy, which we take in two parts: First, is exclusion required-without regard to the reasonableness of the officers' reliance-where, as here, the warrant was void from the outset, as Taylor and Smith urge? Or, as the government contends, should a void *1282 warrant be treated no differently from other defective warrants, such that the good-faith exception to the exclusionary rule can still apply? We hold that, because the exclusionary rule is concerned solely with deterring culpable police misconduct-and not at all with regulating magistrate judges' actions-void and voidable warrants should be treated no differently; accordingly, an officer's reasonable reliance on the former, like the latter, can provide the basis for applying the good-faith exception.
Second, even if the good-faith exception can apply when an officer relies on a void warrant, should the exception apply in the particular circumstances of this case? We hold that the officers' warrant application here adequately disclosed the nature of the technology at issue and the scope of the intended search, that the officers reasonably relied on the magistrate judge's determination that the search was permissible, and, accordingly, that the good-faith exception applies in this case.
I
A
We begin with a bit of context. In the normal world of web browsing, an internet service provider assigns an IP address-a unique numerical identifier-to every computer that it provides with internet access. Websites can log IP addresses to keep track of the computers that visit, in essence creating a digital guest book. Internet browsing, therefore, isn't quite as private as most people think-it's actually pretty easy, for instance, for law enforcement to find out who visited what sites, when, and for how long simply by subpoenaing IP-address logs from service providers.
Not so when it comes to the "dark web," the part of the internet "only accessible by means of special software, allowing users and website operators to remain anonymous or untraceable." Blog.OxfordDictionaries.com.[1] "The Onion Router"-usually abbreviated "Tor"-is one such software program. Tor, which was the brainchild of the U.S. Navy but has since been released to the public, works by routing a user's webpage requests through a series of computer servers operated by volunteers around the globe, rendering the user's IP address essentially unidentifiable and untraceable. In the words of the folks who currently administer the "Tor Project," a Massachusetts-based § 501(c)(3) organization responsible for maintaining Tor, you might think of what Tor does as "using a twisty, hard-to-follow route in order to throw off someone who is tailing you-and then periodically erasing your footprints."[2]
As you can imagine, Tor has plenty of legitimate uses-think military and law-enforcement officers carrying out investigations, journalists seeking to maintain anonymity, and ordinary citizens researching embarrassing topics. As you can also imagine, Tor has spawned-and effectively enables-a cache of unsavory sites for black-market trading, child-pornography file-sharing, *1283 and other criminal enterprises. This is so because, in addition to allowing users to access public websites without leaving a trail, Tor also hosts a number of so-called "hidden services," i.e. , sites accessible only through Tor. You can't just Google a hidden service; rather, a user can access one of these Tor-specific sites only by knowing its exact URL address. Most Tor-site addresses comprise a random jumble of letters and numbers followed by the address ".onion"-in place, say, of ".com" or ".org"-and are shared via message-board postings on the regular internet or by word of mouth.
The hidden-service page at issue here, "Playpen," was a child-pornography-distribution site accessible only through Tor. At the time the FBI began monitoring Playpen, the site contained more than 95,000 posts, had 160,000 members, and hosted up to 1,500 visitors per day. The FBI monitored the site for several months until, based on a foreign-government tip, it found and arrested the administrator. Rather than shuttering Playpen immediately, the FBI covertly took control of the site and began operating it out of a government server in Newington, Virginia, hoping to snare more users.
As a means of ferreting out Playpen visitors whose identities were masked by Tor, the FBI sought to deploy government-created malware-specifically, a computer code called the Network Investigative Technique ("NIT")-that would transmit user information back to the FBI. Here's how the NIT worked: When a Playpen user downloaded images from a Tor-based site, the NIT would essentially "hitchhike" along, invade the host computer, and force it to send to the FBI (among other information) the computer's IP address, the computer's host name, and the username associated with the computer. Based on that information, the FBI could identify the user's internet service provider and the computer affiliated with the account that accessed Playpen, thereby unmasking the user and providing probable cause for the FBI to seek a warrant to seize computers and hard drives.
B
To effectuate this plan, FBI Agent Douglas Macfarlane submitted a search-warrant application to a magistrate judge in the Eastern District of Virginia, requesting authorization to deploy the NIT. The application wasn't a model of clarity or precision, particularly regarding the issue that most concerns us here-namely, the geographic scope of the requested search authority. In the case caption, the application described the "property to be searched"-seemingly without territorial restriction-as "COMPUTERS THAT ACCESS upf45jv3bziuctml.onion," which we now know to be associated with Playpen. Just below, however, in the body, the application asserted a reasonable belief that evidence of child-pornography-related crimes was contained on property "located in the Eastern District of Virginia." As part of the same statement-regarding the "property to be searched"-the application referred to an "Attachment A." Attachment A in turn stated that the NIT was "to be deployed on the computer server ... operating the [Playpen] website" and specified that the server was "located at a government facility in the Eastern District of Virginia." Attachment A then went on to state, though, that the goal of deploying the NIT was to obtain information from "[t]he activating computers ... of any user or administrator who logs into [Playpen] by entering a username and password."
As is often the case, the NIT application also referenced an attached affidavit. Agent Macfarlane's affidavit summarized the applicable law, explained numerous technical terms of art, and described Tor *1284 and the "Target Website"-i.e. , Playpen. On page 29 of 31, under the bolded heading "SEARCH AUTHORIZATION REQUESTS," the affidavit stated, for the first time expressly, that "the NIT may cause an activating computer-wherever located -to send to a computer controlled by or known to the government" certain information, including the IP address and host name.[3]
A magistrate judge in the Eastern District of Virginia signed the warrant and the FBI deployed the NIT.
C
Not long thereafter, NIT-transmitted data revealed to the FBI that a certain Playpen user was linked to a computer with the host name "RyansComputer." After the user accessed several images of child pornography, the FBI sent an administrative subpoena to the user's internet service provider and discovered that the IP address associated with the computer was assigned to James Taylor in Birmingham, Alabama. A magistrate judge in the Northern District of Alabama then authorized a search warrant for Taylor's residence, where the FBI seized Taylor's laptop, hard drive, and USB drive. After analyzing the hardware twice, the FBI found what it was looking for.
Steven Smith's Playpen activities were discovered in a nearly identical way. As in Taylor's case, the NIT revealed that someone had used Smith's computer and IP address to log into Playpen. Based on the NIT data, the FBI subpoenaed records from an internet service provider and used that information to secure a warrant from a magistrate judge in the Northern District of Alabama, allowing officers to search Smith's residence in Albertville, Alabama. The search revealed child-pornography images on a thumb drive. After arresting Smith, the officers obtained a search warrant for his office and seized his work computer, which also contained child pornography.
Taylor and Smith were charged with receiving child pornography under 18 U.S.C. § 2252A(a)(2) and with possessing and accessing child pornography with the intent to view it under 18 U.S.C. § 2252A(a)(5)(B) & (b)(2). They both moved to suppress the evidence against them, asserting, as relevant here, that the NIT warrant violated the Fourth Amendment, Federal Rule of Criminal Procedure 41(b), and the Federal Magistrates Act, 28 U.S.C. § 636(a), and, accordingly, that the seized images should be suppressed as fruit of the poisonous tree. The district court in each case denied the motion to suppress. Both courts agreed that the NIT warrant violated the Fourth Amendment-and was thus void-but declined to suppress the evidence on the ground that the searches, and the resulting seizures, fell within the good-faith exception to the exclusionary rule. Both defendants appealed, and their cases were consolidated for review and decision.
II
All here agree that the NIT's extraction and transmission of Taylor's and Smith's information was a "search" within the meaning of the Fourth Amendment. U.S. Const. amend. IV.[4] All likewise *1285 agree that no exigency or other exception exempted the FBI from the usual requirement to obtain a search warrant. See United States v. Cooks , 920 F.3d 735, 741 (11th Cir. 2019) ("[W]arrantless searches are presumptively unreasonable, 'subject only to a few specifically established and well-delineated exceptions.' " (quoting Katz v. United States , 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) )). There, the agreement ends. The parties vigorously dispute whether the NIT warrant was valid and, if not, whether (and to what extent) that fact should bear on the admissibility of the evidence found. Accordingly, we are faced with the following issues, each with its own twists and turns: (1) Did the NIT warrant violate Federal Rule of Criminal Procedure 41(b) and, if so, did it likewise violate the Fourth Amendment? And (2) if the NIT warrant did run afoul of the Fourth Amendment, does the exclusionary rule apply?[5]
A
1
Federal Rule of Criminal Procedure 41(b), titled "Venue for a Warrant Application," both outlines the situations in which a magistrate judge may issue a warrant for a search within her district and specifies the more limited circumstances in which she may issue a warrant for a search outside her district. With respect to the former, Rule 41(b)(1) states that "a magistrate judge with authority in the district ... has authority to issue a warrant to search for and seize a person or property located within the district." Fed. R. Crim. P. 41(b)(1). It is undisputed, though, that the NIT warrant sought authority to search for information outside the territorial confines of the Eastern District of Virginia. And the parties agree that, for present purposes, Rule 41(b)(4) -which authorizes "tracking device" warrants-is the only provision that could have empowered the magistrate judge to authorize the specific out-of-district search in this case. That rule permits a magistrate "to issue a warrant to install within the district a tracking device" to "track the movement of a person or property located within the district, outside the district, or both ." Fed. R. Crim. P. 41(b)(4) (emphasis added).[6] Accordingly, the NIT warrant complies with Rule 41(b) only if we conclude that it was issued in accordance with subsection (b)(4).[7]
We find two mismatches-one formal (but telling) and the other substantive. Initially, as a matter of form, although the *1286 government now defends the NIT warrant on a tracking-device basis, it conspicuously didn't seek the warrant under Rule 41(b)(4). Tracking-device warrants issued under subsection (b)(4) are generally requested pursuant to a specialized "Application for a Tracking Warrant."[8] Here, though, the FBI seems to have sought the NIT warrant under Rule 41(b)(1)'s general provision for warrants authorizing in-district searches. The warrant application's cover sheet represented that the FBI wished to search property "located in the Eastern District of Virginia," and neither the application nor the accompanying affidavit mentioned the term "tracking device" or otherwise indicated that the application sought authorization under subsection (b)(4). The government's revisionism on appeal-invoking Rule 41(b)(4) to defend what was, by all accounts, a Rule 41(b)(1) application-undermines its position that the Rule's tracking-device provision sanctions the NIT warrant.
Moreover, and in any event, we reject the government's tracking-device argument on the merits. For Rule 41 purposes, a "tracking device" is "an electronic or mechanical device which permits the tracking of the movement of a person or object." 18 U.S.C. § 3117(b) ; see also Fed. R. Crim. P. 41(a)(2)(E) (explaining that " '[t]racking device' has the meaning set out in 18 U.S.C. § 3117(b)"). The government contends that the NIT constitutes a tracking device because "just as a GPS tracker attached to a car will send a receiver coordinates or other signals with locational information, the NIT augmented the content of Playpen and sent locational information back to a government-controlled computer." Br. of Appellee at 15.
We disagree. The NIT didn't "track" anything. Rather, the NIT performed a one-time extraction of information-including a computer's IP address, username, and other identifying material-which it transmitted to the FBI. Of course, the identifying information that the NIT extracted and sent was then traced to a physical address using an internet service provider's records. But that the FBI eventually used the NIT-transmitted information to discover additional facts that, in turn, enabled it to then determine a Playpen user's location in no way transformed the initial information transmittal into "tracking." Indeed, if the term "tracking device" included every gadget capable of acquiring and transmitting information that could somehow, in some way, aid in identifying a person's location, the term would be unimaginably broad, including any phone or camera capable of sending a photo, as images of buildings, street signs, or other landmarks can surely be used to identify a location.[9]
We hold that the NIT is not a "tracking device" within the meaning of Federal Rule of Criminal Procedure 41(b), and we reject the government's post hoc attempts to classify it as such. Because the NIT warrant was not authorized by any of Rule 41(b)'s applicable subsections, the warrant violated the Rule.
*1287 2
So, what effect? While constitutional violations may merit suppression-more on that later-mere "technical noncompliance" with a procedural rule results in the exclusion of evidence only when (1) "there was 'prejudice' in the sense that the search might not have occurred or would not have been so abrasive if the rule had been followed," or (2) "there is evidence of intentional and deliberate disregard of a provision in the Rule." United States v. Williams , 871 F.3d 1197, 1203 (11th Cir. 2017) (citation omitted).
Which do we have here-a constitutional violation or just a technical one? The government says that the violation in this case was merely technical because Rule 41(b) is just a venue provision-it has nothing to do with a magistrate's power or jurisdiction. The government points out, for instance, that as of 2016, Rule 41(b) is no longer titled "Authority to Issue a Warrant," but rather "Venue for a Warrant Application." See Fed. R. Crim. P. 41(b). And, the argument goes, if Rule 41(b) is an ordinary venue provision, a breach of its provisions would not rise to the level of a constitutional violation.
Fair enough. As we've recently been at pains to emphasize-following the Supreme Court's lead-not every mandatory proclamation or prohibition creates a jurisdictional bar, and we are loath to "jurisdictionalize" issues unnecessarily. See, e.g. , Orion Marine Constr., Inc. v. Carroll , 918 F.3d 1323, 1328-29 (11th Cir. 2019) ; Sec'y, U.S. Dep't of Labor v. Preston , 873 F.3d 877, 881-82 (11th Cir. 2017). Here, though, jurisdiction is squarely in play: While Rule 41(b) itself may address only venue, the statute behind the rule-the Federal Magistrates Act, 28 U.S.C. § 636 -imposes clear jurisdictional limits on a magistrate judge's power. Section 636(a) states that magistrate judges "shall have within [their] district[s]" the "powers ... conferred ... by law or by the Rules of Criminal Procedure ." 28 U.S.C. § 636(a)(1) (emphasis added). Because no one contends that any law or Rule other than Rule 41(b) gave the magistrate judge the authority to issue the NIT warrant in this case, when the magistrate issued the warrant outside of Rule 41(b)'s ambit, she necessarily transgressed the limits of her jurisdiction.
We aren't breaking any new ground here. As now-Justice Gorsuch explained during his tenure on the Tenth Circuit, § 636(a) "expressly-and exclusively-refers to the territorial scope of a magistrate judge's power to adjudicate" and, further, is "found in Title 28 of the U.S. Code-the same title as the statutes that define a district court's jurisdiction." United States v. Krueger , 809 F.3d 1109, 1122 (10th Cir. 2015) (Gorsuch, J., concurring). Or, as the Ninth Circuit put it, "federal magistrates are creatures of [ § 636(a) ], and so is their jurisdiction." N.L.R.B. v. A-Plus Roofing, Inc. , 39 F.3d 1410, 1415 (9th Cir. 1994) ; see also United States v. Hazlewood , 526 F.3d 862, 864 (5th Cir. 2008) ("In the Federal Magistrates Act, 28 U.S.C. § 636, Congress conferred jurisdiction to federal magistrate[ ]judge[s]."). Thus, as § 636(a) is the sole source of a magistrate judge's warrant authority, a warrant issued in defiance of its jurisdictional limitations is void-"no warrant at all." Krueger , 809 F.3d at 1118 (Gorsuch, J., concurring).
To be fair, Krueger was an easier case-there, a magistrate judge in one district purported to authorize a search in an adjacent district, in which she clearly had no jurisdiction. The magistrate judge here, by contrast, issued a warrant purporting to allow a search of computers "wherever located"-which, of necessity, included her own district. But the fact that the warrant in its overbreadth happened to sweep in *1288 the Eastern District of Virginia along with the rest of the nation doesn't cure the fact that it was issued outside of the magistrate judge's statutorily prescribed (and proscribed) authority in the first place. Indeed, the idea that a warrant may be issued partially from a place of statutorily-granted authority and partially from the great beyond (with one foot inside and one foot outside the lines, so to speak) strikes us as nonsensical. Rather, it seems to us that a magistrate judge must act either pursuant to the authority granted her by statute or not, and thus have the authority either to issue a warrant (in toto ) or not.[10]
Because the NIT warrant was void at issuance, the ensuing search was effectively warrantless and therefore-because no party contends that an exception to the presumptive warrant requirement applies here-violative of the Fourth Amendment. Accord United States v. Werdene , 883 F.3d 204, 214 (3d Cir.), cert. denied , --- U.S. ----, 139 S. Ct. 260, 202 L.Ed.2d 174 (2018) ; United States v. Horton , 863 F.3d 1041, 1050 (8th Cir. 2017), cert. denied , --- U.S. ----, 138 S. Ct. 1440, 200 L.Ed.2d 721 (2018) ; United States v. Henderson , 906 F.3d 1109, 1116 (9th Cir. 2018), cert. denied , --- U.S. ----, 139 S. Ct. 2033, 204 L.Ed.2d 232 (2019).[11]
B
So the search carried out under the NIT warrant violated not just Rule 41 but also the Fourth Amendment. But again: What effect? At last we come to the question at the heart of the remedy that Taylor and Smith seek. Can the good-faith exception to the exclusionary rule apply in a situation like this, where officers rely on a warrant that is later determined to have been void ab initio ? And more specifically, does the good-faith exception apply in the particular circumstances of this case?
1
The "exclusionary rule"-which operates to bar the admission of evidence obtained in violation of the Fourth Amendment-appears nowhere in the Constitution's *1289 text. It is, the Supreme Court has said, not "a personal constitutional right," but rather a "judicially created" remedy, whose purpose is to "deter future Fourth Amendment violations" and "compel respect for the constitutional guaranty." Davis v. United States , 564 U.S. 229, 236-37, 238, 131 S.Ct. 2419, 180 L.Ed.2d 285 (2011) (citation omitted). This remedy, however, doesn't follow automatically; society must swallow the "bitter pill" of suppression when necessary, id . at 238, 131 S.Ct. 2419, but only when the "benefit" of exclusion outweighs its "substantial social costs," Illinois v. Krull , 480 U.S. 340, 352-53, 107 S.Ct. 1160, 94 L.Ed.2d 364 (1987). The dual pillars of the exclusion decision, the Supreme Court recently emphasized, are deterrence and culpability: "Police practices trigger the harsh sanction of exclusion only when they are deliberate enough to yield 'meaningfu[l]' deterrence, and culpable enough to be 'worth the price paid by the justice system.' " Davis , 564 U.S. at 240, 131 S.Ct. 2419 (alteration in original) (quoting Herring v. United States , 555 U.S. 135, 144, 129 S.Ct. 695, 172 L.Ed.2d 496 (2009) ); see also id . (suppression not warranted because officer did not act "deliberately, recklessly, or with gross negligence").
The good-faith exception is a "judicially created exception to this judicially created rule." Id . at 248, 131 S.Ct. 2419.[12] In United States v. Leon , the Supreme Court explained that exclusion is not warranted when police act "in objectively reasonable reliance" on a subsequently invalidated search warrant-in other words, when they act in "good faith." 468 U.S. 897, 922, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). " '[O]ur good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal' in light of 'all of the circumstances.' " Herring , 555 U.S. at 145, 129 S.Ct. 695 (quoting Leon , 468 U.S. at 922 n.23, 104 S.Ct. 3405 ).
To date, the Supreme Court has applied the good-faith exception when, among other things, officers reasonably relied on a warrant that was later deemed invalid for lack of probable cause, see Leon , 468 U.S. at 922, 104 S.Ct. 3405, on a warrant that erroneously appeared outstanding due to an error in a court or police database, see Arizona v. Evans , 514 U.S. 1, 4, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995) ; Herring , 555 U.S. at 137, 129 S.Ct. 695, on a statute that was later deemed unconstitutional, see Krull , 480 U.S. at 352-53, 107 S.Ct. 1160, and on a judicial decision that was later overruled, Davis , 564 U.S. at 232, 131 S.Ct. 2419. The Supreme Court hasn't, however, directly addressed the particular question before us today-whether the good-faith exception can be applied to a search conducted in reliance on a warrant that was void from the outset.
Taylor and Smith insist that the void-voidable distinction is critical. Reliance on a voidable warrant-issued in error, perhaps, but by a judge with jurisdiction to act-is different, they contend, from reliance *1290 on a warrant that was void from the get-go. Because the latter is-as we've agreed-"no warrant at all," Taylor and Smith insist that reliance on it can't provide an exception to the exclusionary rule. This is so, they continue, because the "heart of the good faith exception is [ ] officers' reliance on a neutral third party's actions within the scope of the third party's authority." Br. of Appellant Taylor at 29; Br. of Appellant Smith at 27.
There is a certain logic to this argument: In fact, there was never a valid warrant, so the search was illegal all along. What matters for exclusionary-rule and good-faith purposes, though, isn't the validity of the warrant "in fact," but rather the validity of the warrant as it would have reasonably appeared to an officer tasked with executing it. The appropriate question, therefore, is whether, from the perspective of a reasonable officer, there is any difference-for deterrence or culpability purposes-between the warrant issued in this case and the warrants issued in Leon , Evans , and Herring ?
We don't think so. The exclusionary rule is concerned with deterring officer misconduct and punishing officer culpability-not with setting judges straight. See Herring , 555 U.S. at 142, 129 S.Ct. 695 (observing that the "exclusionary rule was crafted to curb police rather than judicial misconduct"). Viewed from an officer's perspective, relying on a facially valid warrant that, as it turns out, was void from the beginning is no different from relying on a facially valid warrant that, for instance, was later deemed improper based on a dubious determination of probable cause, see Leon , 468 U.S. at 925-26, 104 S.Ct. 3405, or appeared outstanding thanks only to a database error, see Herring , 555 U.S. at 136-37, 129 S.Ct. 695. So long as an officer could reasonably have thought that the warrant was valid, the specific nature of the warrant's invalidity is immaterial.
In so holding, we join every court of appeals to consider the question, all of which have agreed that the good-faith exception applies-and the exclusionary rule doesn't-in a situation like this. See United States v. Eldred , No. 17-3367-cv, 933 F.3d 110, 121, 2019 WL 3540415, at *8 (2d Cir. Aug. 5, 2019) ; United States v. Ganzer , 922 F.3d 579, 587-90 (5th Cir. 2019), petition for cert. filed , No. 19-5339 (2019); United States v. Moorehead , 912 F.3d 963, 971 (6th Cir.), petition for cert. filed , No. 19-5444 (2019); Werdene , 883 F.3d at 216-17 ; United States v. McLamb , 880 F.3d 685, 691 (4th Cir.), cert. denied , --- U.S. ----, 139 S. Ct. 156, 202 L.Ed.2d 95 (2018) ; United States v. Kienast , 907 F.3d 522, 527-28 (7th Cir. 2018), cert. denied , --- U.S. ----, 139 S. Ct. 1639, 203 L.Ed.2d 902 (2019) ; Henderson , 906 F.3d at 1118 ; United States v. Levin , 874 F.3d 316, 323-24 (1st Cir. 2017) ; Horton , 863 F.3d at 1050 ; United States v. Workman , 863 F.3d 1313, 1319 (10th Cir. 2017), cert. denied , --- U.S. ----, 138 S. Ct. 1546, 200 L.Ed.2d 748 (2018). As the Sixth Circuit summarized, "[t]he good-faith exception is not concerned with whether a valid warrant exists, but instead asks whether a reasonably well-trained officer would have known that a search was illegal." Moorehead , 912 F.3d at 968. The Third Circuit similarly explained the "fundamental flaw" in the argument like the one that Taylor and Smith make here: "[I]t does not appreciate the distinction between the validity of the warrant and the deterrence rationale of the exclusionary rule and the good-faith exception." Werdene , 883 F.3d at 216.
In light of the exclusionary rule's purpose of deterring culpable police misconduct, there is no reason to distinguish between good-faith reliance on a void warrant and any other warrant later deemed defective. We thus hold that the good-faith exception to the exclusionary rule can apply *1291 when police officers reasonably rely on a warrant later determined to have been void ab initio .
2
Finally, then, to this particular case: Having determined that the good-faith exception can apply in situations involving void warrants, the question remains whether the exception should apply to the cases before us today. In Leon , the Supreme Court laid out several situations in which the good-faith exception should not apply: (1) where the magistrate judge was misled by information in a warrant application that the applicant knew was false or would have known was false but for a reckless disregard of the truth; (2) where the magistrate "wholly abandoned" her judicial role; (3) where the affidavit supporting the warrant application was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; or (4) where the warrant was "so facially deficient" that officers couldn't have reasonably presumed it to be valid. 468 U.S. at 923, 104 S.Ct. 3405.
Here, Taylor and Smith contend-and the dissent agrees-that the magistrate was, within the meaning of Leon , "misled by information" in the application that the FBI officers knew, or should have known, to be false. The face of the application, they say, prominently represented that the "property to be searched" was "located in the Eastern District of Virginia" and, more specifically, asserted (in the incorporated Attachment A) that the Playpen server was "located at a government facility in the Eastern District of Virginia." Br. of Appellant Taylor at 42; Br. of Appellant Smith at 41. It wasn't until page 29 of Agent Macfarlane's 31-page affidavit, Taylor and Smith say, that the application finally acknowledged that the NIT would search computers "wherever located." Br. of Appellant Taylor at 42; Br. of Appellant Smith at 41. This approach, they contend, shows that the FBI intentionally misled the magistrate judge and belies any claim to good-faith reliance.
In responding that the good-faith exception should apply, the government begins with the contention that there is no deterrent benefit to exclusion here because Rule 41 was recently amended to add a new subsection to cover remote-access warrants to search electronic storage both within and outside of a magistrate judge's district-i.e ., precisely the sort of search at issue in this case.[13] But that argument cuts both ways. On the one hand, it indicates that we needn't necessarily deter this particular type of search on a going-forward basis. On the other, the recent amendment of Rule 41 to allow remote-access search warrants underscores that Rule 41(b) did not permit these warrants at the time the FBI deployed the NIT.
Even so, we find no indication that the FBI officers sought to deceive the magistrate judge or otherwise acted culpably or in a way that necessitates deterrence-and certainly no indication of the sort of "deliberate[ ], reckless[ ], or ... gross[ly] negligen[t]" conduct that the Supreme Court has recently highlighted as the focus of the exclusionary-rule/good-faith inquiry. Davis , 564 U.S. at 240, 131 S.Ct. 2419 ; see also Herring , 555 U.S. at 144, 129 S.Ct. 695 ; Krull , 480 U.S. at 352-53, 107 S.Ct. 1160. While the NIT-warrant application *1292 was perhaps not a model of clarity, it seems clear to us that the officers did the best they could with what they had-a general application form that was perhaps ill-suited to the complex new technology at issue.[14] It is true, as Taylor and Smith emphasize, that the face of the pre-printed warrant application stated that "the property to be searched" was "located in the Eastern District of Virginia." It is also true that Attachment A, which described the target property, reported that the Playpen server was "located at a government facility in the Eastern District of Virginia." That being said, there were indications that the FBI was seeking more broad-ranging search authority. As already noted, the case caption referred generally to "COMPUTERS THAT ACCESS" Playpen. Somewhat more clearly, Attachment A explained that the NIT would be "deployed on" the Playpen-operating server located in the Eastern District of Virginia as a means of "obtaining information" from "activating computers," defined as computers "of any user or administrator who logs into" the Playpen site. Finally, and most importantly-if a bit more obscurely than might have been ideal-Agent Macfarlane's affidavit stated that "the NIT may cause an activating computer-wherever located -to send" identifying information to the FBI.
So, was the warrant application here perfect? Not close. But does it evidence "chicanery," "duplicity," and "gamesmanship"? See Dissenting Op. at 1300, 1304. It doesn't. We conclude that, in their totality, the application and affidavit sufficiently disclosed the bounds of the intended search. In light of the square-peg/round-hole issue that they faced, the officers did what we would hope and expect-they fully disclosed the mechanics of the intended search, left the constitutional call to the magistrate judge, and acted in reasonable reliance on the resulting warrant.[15] As already explained, the "exclusionary rule *1293 was crafted to curb police rather than judicial misconduct." Herring , 555 U.S. at 142, 129 S.Ct. 695. Because we don't find the officers' behavior here culpable and see no deterrent value in suppressing the evidence found on Taylor's and Smith's computers, we find that the good-faith exception to the exclusionary rule applies in this case.
AFFIRMED.

See also Ahmed Ghappour, Searching Places Unknown: Law Enforcement Jurisdiction on the Dark Web , 69 Stan. L. Rev. 1075, 1087 (2017) ("The dark web is a private global computer network that enables users to conduct anonymous transactions without revealing any trace of their location.").

See Lee Matthews, What Tor Is, and Why You Should Use It to Protect Your Privacy , Forbes (Jan. 27, 2017, 2:30 p.m.), https://www.forbes.com/sites/leemathews/2017/01/27/what-is-tor-andwhy-do-people-use-it/#3186d5387d75 (last visited Aug. 27, 2019); see also Tor Project, https://2019.www.torproject.org/projects/torbrowser.html.en ("[Tor] prevents somebody watching your Internet connection from learning what sites you visit, it prevents the sites you visit from learning your physical location, and it lets you access sites which are blocked.") (last visited Aug. 27, 2019).

The warrant also explained that the NIT would send the following information: the unique identifier that distinguishes the data on the host computer from that of other computers, the type of operating system the host computer is running, whether the NIT has already been downloaded to the host computer, an active operating system username, and a Media Access Control address.

That Taylor and Smith used Tor to download child pornography is important because it takes this case out of third-party-doctrine land. See Smith v. Maryland , 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979). Instead of traveling along the equivalent of "public highways" (by browsing the open internet) or leaving the equivalent of a calling card at each website visited (as with a normal internet search), Tor users purposefully shroud their browsing, such that they have a reasonable expectation of privacy in their online "movements." See United States v. Davis , 785 F.3d 498, 507 (11th Cir. 2015) (explaining that the Fourth Amendment's protections apply where an individual has exhibited "a subjective expectation of privacy" that society recognizes as reasonable (citation omitted)).

In reviewing a district court's denial of a motion to suppress, we review factual findings for clear error and the application of law to those facts de novo . United States v. Ramirez , 476 F.3d 1231, 1235 (11th Cir. 2007). Where, as here, the facts are undisputed, we simply review the legality of a search de novo . United States v. Phillips , 834 F.3d 1176, 1179 (11th Cir. 2016).

As it turns out, Rule 41(b) has since been amended to add a provision-subsection (b)(6)-for remote electronic searches of the sort at issue in this case. See infra Section II.B.2.

No court of appeals has found that the NIT warrant fits within the tracking-device exception, although this argument has persuaded a few district courts. See United States v. Taylor , 250 F. Supp. 3d 1215, 1222-23 (N.D. Ala. 2017) (compiling district and appellate court holdings on NIT-warrant searches).

See, e.g. , Administrative Office of U.S. Courts, Criminal Forms AO 102 (2009) & AO 104 (2016), http://www.uscourts.gov/forms/criminal-forms (last visited Apr. 26, 2019).

The government also points out that the NIT was deployed from a computer in the Eastern District of Virginia-which, it says, is the equivalent of a tracking device being "installed within the district." But a GPS tracker that is physically attached to an item within the territorial confines of a particular district is clearly "install[ed] within" that district. By contrast, the NIT software, although deployed and activated from a government computer in the Eastern District of Virginia, was not "installed within" that district-it was installed on suspects' computers outside of the district.

Nor do we see a persuasive case for "severing" the NIT warrant, so to speak, along jurisdictional lines-such that it might be deemed valid in the Eastern District of Virginia, even if invalid everywhere else, and thus not void ab initio and in toto (to really pour on the Latin). We are aware, of course, that several courts have held that a warrant can be severed along what might loosely be called subject-matter lines-i.e. , with respect to probable cause or particularity. See, e.g. , United States v. George , 975 F.2d 72, 79 (2d Cir. 1992) ("When a warrant is severed (or redacted) the constitutionally infirm portion-usually for lack of particularity or probable cause-is separated from the remainder and evidence seized pursuant to that portion is suppressed; evidence seized under the valid portion may be admitted."). But the flaws in the two situations, it seems to us, are fundamentally different. Subject-matter severance addresses an error made by a properly empowered official; the error that plagues the NIT warrant is more fundamental-it implicates the magistrate judge's power to act in the first instance.

The government also contends-in nearly identical terms in both cases-that "[b]ecause the search of Taylor's [and Smith's] computer[s] would have been valid if a magistrate judge in the Northern District of Alabama had signed the NIT Warrant, any Rule 41(b) violation did not cause [them] prejudice" and suppression is not necessary. Br. of Appellee at 34 (emphasis added) (Taylor); see also Br. of Appellee at 29 (Smith). "Taylor [and Smith] suffered no more of an intrusion of [their] privacy," the government contends, "than [they] would have if the FBI had searched [their] computer[s] under a valid warrant." Br. of Appellee at 31 (Taylor); see also Br. of Appellee at 28 (Smith). No. Had the magistrate judge in the Eastern District of Virginia acted within her jurisdiction, the warrant could not have extended to Alabama and the FBI would not have identified Taylor or Smith, nor would it have had probable cause to apply for a second warrant to search their homes.

Although "good faith" is most often framed as an "exception" to the exclusionary rule, it is probably more accurately described as a reason for declining to invoke the exclusionary rule in the first place. Compare, e.g. , Davis , 564 U.S. at 238, 131 S.Ct. 2419 ("The Court has over time applied this 'good-faith' exception across a range of cases." (emphasis added)), with, e.g ., id . at 239, 131 S.Ct. 2419 ("The question in this case is whether to apply the exclusionary rule when the police conduct a search in objectively reasonable reliance on binding judicial precedent." (emphasis added)), and Herring v. United States , 555 U.S. 135, 139, 129 S.Ct. 695, 172 L.Ed.2d 496 (2009) (characterizing the question presented as "whether the exclusionary rule should be applied" when officers act in reasonable reliance on a negligent police database error (emphasis added)).

Rule 41(b)(6) now states in relevant part: "[A] magistrate judge with authority in any district where activities related to a crime may have occurred has authority to issue a warrant to use remote access to search electronic storage media and to seize or copy electronically stored information located within or outside that district if ... the district where the media or information is located has been concealed through technological means."

In concluding that the officers intended to "hoodwink" the magistrate judge, the dissent relies heavily on DOJ's proposals to amend Rule 41 to better address "remote searches for 'crimes involving Internet anonymizing technology.' " Dissenting Op. at 1296, 1300, (quoting Letter from Mythili Raman, Acting Assistant Att'y Gen., to Hon. Reena Raggi, Chair, Advisory Comm. on the Crim. Rules (Sept. 18, 2013)). Even setting aside the dubious proposition that knowledge of communications between the "highest ranking officials in the Criminal Division" and Federal Rules Advisory Committee Chairs can be imputed downstream to line-level law-enforcement officers, see Dissenting Op. at 1296-97, these communications in no way demonstrate that the warrant application here was made in bad faith. We see no benefit to deterring officers from attempting to describe cutting-edge countermeasures using the forms and resources at their disposal while department heads simultaneously seek to amend the rules to better address advancing technology. Cf. Eldred , 933 F.3d at 119-20, 2019 WL 3540415, at *7 ; McLamb , 880 F.3d at 691. The dissent's argument to the contrary is based entirely on speculation about what different government actors could have known.

To the extent that the dissent suggests that officers seeking a search warrant have an affirmative obligation to "flag" potential legal issues in their application, we must respectfully disagree. See, e.g. , Dissenting Op. at 1297 (stating that the officers here "should have known ... that the magistrate's jurisdiction to issue the warrant was in doubt" and that they "had an obligation to flag [this] for the magistrate"). Law-enforcement officers have a duty to lay out facts-including jurisdictional facts-for reviewing courts, not to anticipate and articulate possible legal hurdles. The warrant application here, particularly when read in conjunction with Agent Macfarlane's detailed 30-plus-page affidavit, adequately-if imperfectly-lays out the facts. See, e.g. , Levin , 874 F.3d at 323 (determining that there was "no benefit in deterring" the government from "turn[ing] to the courts for guidance" when faced with a novel legal question such as whether the NIT warrant could properly issue).